**KETTLE RANGE CONSERVATION GROUP; Leavenworth Adopt–A–Forest, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE; Harv Forsgren; Robert Vaught, Defendants.**

**No. CS–00–0031–JLQ.**

United States District Court, E.D. Washington.

July 10, 2001.

Tom P May, Law Offices of Tom P May, Mark Edward Wilson, University Legal Assistance, Spokane, WA, for plaintiffs.

William Herbert Beatty, U.S. Attorney's Office, Spokane, WA, for U.S. Forest Service, Harv Forsgren, Robert Vaught and Rolando Ortega.

Galen George Barry Schuler, Perkins Coie, Seattle, WA, Robert A. Maynard, Perkins Coie LLP, Boise, ID, for Vaagen Bros. Lumber, Inc., Idaho Forest Owners Association, Intermountain Forest Association, Northwest Forestry Association, and Washington Farm Forestry Association.

**MEMORANDUM ORDER AND OPINION GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ENJOINING BARK BEETLE PROJECT IN COLVILLE NATIONAL FOREST**

QUACKENBUSH, Senior District Judge.

Before the court is Plaintiffs' Motion for Summary Judgment (Ct.Rec.59), Defendant–Intervenor Vaagen Brothers Lumber's Motion for Summary Judgment (Ct. Rec.50), the Motion for Summary Judgment filed by all other Defendants ("the Federal Defendants") (Ct.Rec.46), and various related motions. The court held a hearing on these motions on June 25, 2001. Plaintiffs were represented by Mark Wilson. The Federal Defendants were represented by William Beatty and Val Black. The Defendant–Intervenor was represented by Robert Maynard and Rocco Treppiedi.

TABLE OF CONTENTS

I. Background ......................................................... 1112

II. Summary Judgment Standard of Review ................................... 1113

III. Procedural Challenges ............................................... 1114
 A. Standing ......................................................... 1114
 B. Exhaustion ....................................................... 1114
 C. Abandonment of Claims ............................................ 1114
 D. Scope of the Record .............................................. 1114

IV. The Merits of the Summary Judgment Motions .......................... 1116
 A. Standard of Review for Administrative Decisions .................. 1116
 B. Scope of the Statement of Purpose (Second Claim) ................. 1117
 C. The Breadth and Nature of the Alternatives Considered (Second Claim, Third Claim) ................................................. 1118
 D. Analysis of Project's Effects .................................... 1121
 1. Effects of the Project on Specific Environmental Elements ..... 1121
 a. Fuels and Fire ...................................... 1121
 b. Vegetation .......................................... 1122
 c. Watershed ........................................... 1123
 d. Fisheries ........................................... 1123
 e. Wildlife ............................................ 1124
 f. Soils ............................................... 1125
 2. Cumulative Impacts Analysis (Seventh, Eighth, and (Ninth Claims) .... 1127
 E. The Role of Financing and the Lack of Disclosure (Fifth Claim) ......... 1132

V. The Need For and the Scope of the Injunction ......................... 1135

VI. Conclusion ................................................................ 1141

### I. Background

This case is on remand from the Ninth Circuit Court of Appeals for a consideration of the merits of the pending cross-motions for summary judgment. As explained in this court's earlier orders, this case concerns what is known as the Douglas-fir Bark Beetle Project (the "Project"), a timber harvest and restoration project adopted by the Colville National Forest (the "CNF") and the Idaho Panhandle National Forest. The Project is the response of the United States Forest Service (the "USFS") to an outbreak of the Douglas-fir bark beetle in Eastern Washington and Northern Idaho forests.

The Douglas-fir bark beetle is an insect that targets and kills Douglas firs by boring into the bark of a tree. The beetle lays eggs which hatch into larvae that tunnel around the tree, eventually girding and killing it. The beetle is native to this region but the beetle population is cyclical and prone to periodic "outbreaks" in which the population soars and large numbers of trees are killed.

Eastern Washington and Northern Idaho forests have suffered from such an outbreak. The ice and snow storms that swept over the region during the 1996–1997 winter severely damaged many trees, rendering them susceptible to beetle attack. By the summer of 1998, the USFS had identified a booming beetle population and a large number of dead or dying Douglas fir. In the winter months of 1998, it began preparing a Draft Environmental Impact Statement (the "Draft EIS") to address the problem.

The Draft EIS was released for public comment in January 1999. The Draft EIS set forth five different possible courses of action: the mandatory "no-action" alternative under which nothing would be done to respond to the outbreak, and five alterna-tives which offered various blends of timber harvest and restoration projects. After considering and responding to the comments of more than 200 individuals and organizations, the Federal Defendants issued the Final Environmental Impact Statement (the "FEIS") in June 1999. FEIS, II–1, II–2.

The FEIS contains seven alternatives, the five in the Draft EIS and two others that were added in response to public comments: a harvest/restoration alternative that would focus on protecting private lands from beetles and wildfire, and a "restoration-only" alternative that would involve the same restoration projects as other "action" alternatives but would eliminate the proposed logging element of the Project.

The FEIS analyzes the Project as it relates to both the CNF and the Idaho Panhandle National Forest. For the Newport Ranger District of the CNF and two districts of the Idaho forest, the FEIS analyzes the potential effects of the various alternatives on vegetation, sensitive plant species, watershed, fisheries, soil, fire, air quality, wildlife, recreation, scenery, and finances. Each district is analyzed separately. This case concerns only the Newport Ranger District of the CNF.

On June 11, 1999, Robert Vaught, the then-Forest Supervisor of the CNF issued a Rule of Decision ("the ROD") in which he adopted Alternative D of the FEIS for implementation in the CNF. Alternative D identifies 47 problem areas which the USFS had determined to be infested or likely to be infested by the bark beetle. Alternative D addressed those problem areas through a number of methods, including "selective" and "regenerative" harvest of over 4,600 acres, prescribed burning of another 3,269 acres, and treatment of fire fuel on 1,493 acres by "lopping and scatter-

ing" dead or dying trees. Much of the proposed harvest and treatment, however, was contingent upon whether the beetle actually spread to all of the areas that Federal Defendants predicted it would spread to. FEIS, II–16 to –19.

Alternative D also includes a number of restorative projects. On the harvested acres, the USFS would plant tree species that are resistant to the bark beetle and were historically predominant in the CNF, such as the white pine, western larch, and ponderosa pine. The USFS would also remove 8.8 miles of road in the CNF, reconstruct another 14 miles, and improve three stream crossings in order to lessen the impact on CNF watersheds. No new roads would be built as a result of the Project. FEIS, II–19.

Plaintiff Kettle Range Conservation Group, along with other organizations, appealed the decision to implement Alternative D to the Regional Forester. The appeal was denied on September 29, 1999. (Ct.Rec. 48, Tab A.)

In the months that have passed since the publication of the FEIS and ROD, Federal Defendants have determined that the bark beetle has not spread as quickly or as far as the FEIS anticipated. Accordingly, the Project has been scaled back considerably in the CNF. Federal Defendants have also made various adjustments to harvest methods, Project maps, and other items since the publication of that FEIS and the ROD. They have not, however, made the Project changes public through another draft EIS.

Plaintiffs filed suit in this court on February 1, 2000, alleging numerous violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600–1612. Plaintiffs ask this court to either enjoin the Project's implementation in the CNF or to order the Federal Defendants to prepare a supplemental EIS that addresses the numerous changes made to the Project since its adoption in June 1999. (Second Amended Complaint, Ct.Rec. 43.)

Plaintiffs, Federal Defendants, and Defendant–Intervenor have each filed a cross-motion for summary judgment. At the first hearing on these motions, on June 7, 2000, this court expressed concern that Plaintiffs had not established standing. The court ordered supplemental briefing on the issue and did not reach the merits of the cross-motions. As part of their supplemental materials, Plaintiffs submitted additional declarations to establish standing. This court ruled that Plaintiffs were not entitled to submit the late declarations, that the prior declaration did not establish standing, and that therefore this court did not have jurisdiction over the case. Plaintiffs appealed the rejection of the additional declarations. The Ninth Circuit reversed this court on the issue of the admissibility of the additional declarations and remanded for further hearing on the cross-motions. The court has held that hearing and now issues its opinion on the merits of those motions.

## II. Summary Judgment Standard of Review

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *See Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in favor of the nonmoving party, there are no genuine issues of material fact in dispute. *See* Fed.R.Civ.P. 56(c). The moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.E.2d 202 (1986).

### III. Procedural Challenges

In the briefing, Federal Defendants and Defendant–Intervenor (collectively, "the Defendants") have raised numerous procedural challenges to Plaintiffs' claims. The court must address those challenges before it may consider the substance of Plaintiffs' claims.

#### A. *Standing*

There is no dispute amongst the parties that the belated declarations submitted by the Plaintiffs establish standing under Article III of the U.S. Constitution. This court agrees that the declarations establish standing and that it has jurisdiction to consider the merits of this case.

#### B. *Exhaustion*

Federal Defendants claim in their response brief that Plaintiffs have not administratively exhausted all of their claims and therefore should be barred from arguing to this court the unexhausted claims. Specifically, Federal Defendants claim that Plaintiffs did not challenge on appeal the Federal Defendants' consideration of sensitive plants, gray wolves, bald eagles, lynx, wolverines, or grizzly bears. (Ct. Rec.80, p. 4.)

Federal Defendants are correct that Plaintiffs can present only those claims that they have completely exhausted through the USFS administrative processes. *See generally Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). They are incorrect, however, in their conclusion that Plaintiffs did not appeal the review of the mammal species listed above. Plaintiffs have submitted a section of the administrative appeal which addresses the analysis of the wolf, lynx, wolverine, and grizzly bear.

Plaintiffs have not, however, exhausted their claim that the Federal Defendants failed to adequately consider the effects of the Project on sensitive plants and sensitive plant habitat. They argue that they did exhaust that claim, but the pages of their appeal that they cite do not discuss sensitive plants. Nor has this court found any discussion of sensitive plants in its review of the appeal. The court therefore may not consider the claim that the effects on sensitive plants were not adequately considered. *See Kleissler v. United States Forest Service*, 183 F.3d 196, 202 (3rd Cir. 1999). It should be noted, however, that this is not a great loss to Plaintiffs' case, as the FEIS quite clearly states that no plants classified as sensitive plants are known to exist anywhere in the areas subject to the CNF portion of the Project. FEIS, III–683 to –685.

#### C. *Abandonment of Claims*

In their brief in support of summary judgment, Plaintiffs stated that they "do not press, in this motion, the First, Fourth and Sixth Claims for Relief set forth in their Second Amended Complaint." (Ct. Rec.60, p. 3.) Plaintiffs then stated in their response to Defendant–Intervenor's motion for summary judgment that they "will ask the court by separate motion to dismiss" those claims. (Ct.Rec. 84 at 2.) Plaintiffs moved at the summary judgment hearing to dismiss those claims and the court granted the motion at that time.

#### D. *Scope of the Record*

Both Plaintiffs and Federal Defendants have submitted affidavits which attempt to expand upon the voluminous administrative record. Each of these affidavits is the subject of a motion to strike.

Plaintiffs have offered two declarations. One is that of Timothy Ingalsbee, the co-director of the Cascadia Fire Ecology Ed-

ucation Project. Plaintiffs have since withdrawn the declaration. (Ct.Rec.105, p. 4.)

Plaintiffs also offer the declaration of Elizabeth Allen. Allen has attached to her declaration a group of logging applications. The applications, which were submitted to State of Washington by private landowners in the winter and spring of 1999, involve lands in or near the Project's analysis area. (Ct.Rec.63.) Federal Defendants have moved to strike the declaration and Defendant–Intervenor has joined in the motion. (Ct.Rec.71.)

■ Defendant–Intervenor, meanwhile, offers the declaration of Brett Winterowd, a professional forester who provides consulting services to Defendant–Intervenor and other timber companies. Winterowd seeks to inform the court as to the condition of Defendant–Intervenor's privately owned forest and its vulnerability to forest fire. Plaintiffs have moved to strike this declaration. (Ct.Rec.103.)

All the parties to this litigation, and this court, agree that this case raises the procedural question of whether the Federal Defendants adequately considered all of the environmental effects of the Project before adopting it. As such, the record of the decisionmaking process is paramount. This court's task is to determine whether that record is sufficient under the applicable law.

Winterowd's declaration, therefore, is not relevant to the determination of whether the FEIS is in compliance with NEPA. However, it is relevant for the purposes of whether an injunction would be proper to remedy any NEPA violations. *See, e.g., Alaska Wilderness Recreation & Tourism v. Morrison,* 67 F.3d 723, 732 (9th Cir. 1995). It will therefore be admitted for that limited purpose.

■ Allen's declaration presents a different issue. Allen presents numerous private logging applications that were filed and approved in the Project area during the period that the Project was under consideration. Most of these private projects were not analyzed in the FEIS despite a requirement that agencies consider such projects in their environmental analysis. *See* 40 C.F.R. § 1508.7; *discussion, infra.* The information is therefore highly relevant to a determination of whether the USFS considered all of the information that was available.

Defendants argue that no matter how relevant the information is, it is still not admissible. According to Defendants, this court can only consider documents outside the record when 1) the agency's explanation is so inadequate that it frustrates review; 2) the agency has relied on materials not included in the record; 3) it is necessary to explain complex terms or subject matter; or 4) there is a strong showing of bad faith or improper behavior. *See Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436–39 (9th Cir.1988), *as amended by* 867 F.2d 1244 (9th Cir.1989). However, Defendants have overlooked the Ninth Circuit's further statement in *Animal Defense Council* that "[t]he court's inquiry outside the record is limited to determining *whether the agency has considered all of the relevant factors....* " *Id.* at 1436. Allen's declaration and the attachments to it bear directly on whether the agency considered all of the relevant factors and therefore the court will consider its contents. Without this information, the court would never be able to determine whether the Federal Defendants adequately considered all of the relevant private projects in the area.

Plaintiffs' Motion to Strike (Ct.Rec.103) is DENIED. Federal Defendants' Motion to Strike (Ct.Rec.71) is DENIED.

## IV. The Merits of the Summary Judgment Motions

### A. *Standard of Review for Administrative Decisions*

The parties are in substantial disagreement about what standard of review this court should apply when reviewing Plaintiffs' claims. Defendants argue that this court should apply a highly deferential standard, and look only for agency action that was "arbitrary or capricious." Plaintiffs, on the other hand, argue that this court should determine whether the Federal Defendants acted reasonably. Both of them are partially correct.

Defendants are correct that, in general, this court must grant substantial deference to the decisions and actions of the Federal Defendants in adopting and implementing the Project. NEPA "does not mandate particular results, but simply describes the necessary process" that an agency must follow in issuing an EIS. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Accordingly, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In other words, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Id., quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The "reasonableness" standard Plaintiffs urge this court to apply is merely an exception to the generally applicable rule stated in *Marsh, supra.* As noted in *Alaska Wilderness Recreation and Tourism Assoc. v. Morrison,* 67 F.3d 723, 727

(9th Cir.1995), the "reasonable" standard of review applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. Thus, for example, when an agency's decision is based largely on its interpretation of a Congressional statute, a court should apply the "reasonableness" standard. *See id.* By contrast, when the agency has used its expertise to resolve factual disputes and choose among several different alternative avenues of action, the "arbitrary or capricious" standard applies. *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1331 (9th Cir.1992); *Muckleshoot Indian Tribe v. U.S. Forest Service,* 177 F.3d 800, 809 (9th Cir.1999).

That said, each of these standards of review apply to certain aspects of this case. Most of Plaintiffs' claims concern whether the analysis in the FEIS and the election of Alternative D violated NEPA and the NFMA. The analysis and the election of Alternative D are intensely factual and highly dependent upon the application of agency expertise. The court will therefore apply the "arbitrary or capricious" standard to the claims bearing on the sufficiency of the analysis and the wisdom of choosing Alternative D. Under that standard, if the court is "satisfied that [the USFS] has taken a 'hard look' at [the Project's] environmental consequences, [this court's] review is at an end." *City of Carmel–by–the–Sea v. United States Department of Transportation,* 123 F.3d 1142, 1151 (9th Cir.1995), *quoting Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992).

The court will apply the "reasonableness" standard to two of Plaintiffs' claims. One of Plaintiffs' claims touches on whether the statement of purpose and need set forth in the FEIS is overly narrow. The Ninth Circuit has indicated that the proper standard of review for such a claim is "reasonableness." *Friends of Southeast's*

*Future v. Morrison,* 153 F.3d 1059, 1066–67 (9th Cir.1998). Plaintiffs have also requested that this court determine whether the Federal Defendants violated NEPA by not issuing a supplemental or replacement EIS when it became clear the beetle outbreak was not a serious as anticipated. The Ninth Circuit has indicated that because that a review of a decision not to issue a supplemental EIS involves primarily legal questions, courts should apply the reasonableness standard. *See Friends of Southeast's Future, supra,* 153 F.3d at 1062; *Alaska Wilderness, supra,* 67 F.3d at 727.

**B.** *Scope of the Statement of Purpose* (Second Claim)

■ Plaintiffs claim that the Federal Defendants violated NEPA by setting forth a statement of purpose and need that effectively eliminated any alternative that did not include timber harvest as part of the Project. The challenged statement, found in the FEIS under the heading "Purpose and Need for Action," is as follows:

> The purpose of this project is to respond to the Douglas-fir beetle outbreak by restoring vegetation and aquatic ecosystems utilizing timber harvest and the recovered value to accomplish the restoration objectives. FEIS, I–9.

The statement proceeds to discuss the need to replace stands of Douglas fir with historically dominant species, improve fisheries, reduce fire fuels, and recover the value of the dead and dying Douglas firs. However, it is the initial statement of purpose that Plaintiffs challenge.

Plaintiffs' argument is that by including timber harvest as part of the purpose or need of the Project, the statement of purpose automatically renders any non-harvest alternative dead on arrival because it is inherently at odds with the Project's stated purpose. Thus, Plaintiffs argue, the Federal Defendants have violated the requirement that an EIS "rigorously explore and objectively evaluate all reasonable alternatives . . ." 40 C.F.R. § 1502.14(a).

Plaintiffs' claim has some support in Ninth Circuit case law. In the *City of Carmel–by–the–Sea v. United States Department of Transportation,* 123 F.3d 1142, (9th Cir.1995), the court held that "the stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *Id.* at 1155, *citing Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991). The question, then, is whether the stated purpose in this case was too narrow. As discussed earlier, the court will apply the less deferential "reasonableness" standard when reviewing this claim. *See id.; Friends of Southeast's Future, supra,* 153 F.3d at 1066–67.

This court is not aware of any case in which the Ninth Circuit found a statement of purpose to be unreasonably narrow. In fact, the court has found reasonable much more restrictive statements of purpose than the one at issue in this case. In *Muckleshoot Indian Tribe v. U.S. Forest Service,* 177 F.3d 800 (9th Cir.1999), for example, the USFS had negotiated a land swap with Weyerhauser Company in which the company agreed to transfer several thousand acres of privately-owned land adjacent to federal property in exchange for a smaller parcel of federal property. *See id.* at 803. After the deal was struck, the USFS prepared an EIS with the following statement of purpose: to "consolidate ownership and enhance future resource conservation and management by exchanging parcels of National Forest System and Weyerhauser land." *Id.* at 812. Even though this statement of purpose essentially ruled out any alternatives that did not closely resemble the deal between the

**1118**

USFS and Weyerhauser, the court found that it was reasonable in light of the regional forestry plan, which had a goal of creating consolidated land ownership patterns. *See id.* at 812–13.

Similarly, in *Friends of Southeast's Future, supra,* the Ninth Circuit also found the USFS had acted reasonably when it issued an EIS with the stated purpose of "providing 89 MMBF of timber to meet market demand," even though the statement of purpose also explicitly foreclosed any and all consideration of an alternative which would provide a lesser amount of timber to the market. 153 F.3d at 1066–67.

By contrast, the statement of purpose in this case, while it presupposes an element of logging, does not restrict the Project to logging at a minimum number of board feet or engaging in a particular transaction. Rather, the statement of purpose leaves considerable room for the development of alternatives with varying degrees of timber harvest. In fact, a review of the harvest alternatives reveals that the amount of logging under the alternatives ranged from 1521 acres under Alternatives B, C, and E, to 3384 acres under Alternative F, to 4762 acres under Alternative D. FEIS, II–9 to II–26. Given the nature of the statements held reasonable under *Muckleshoot* and *Friends,* this court holds that the statement of purpose and need in this case was also reasonable.

C. *The Breadth and Nature of the Alternatives Considered* (Second Claim, Third Claim)

■ Plaintiffs claim that the Federal Defendants violated NEPA by failing to consider a wider array of alternatives. This claim focuses on the fact that the Draft EIS contained only the "no action" alternative, which is required under 40 C.F.R. § 1502.14(d), and four "action" alternatives that included varying levels of timber harvest. As noted earlier, the court reviews this claim to determine if the range of alternatives was the result of an arbitrary or capricious decision by the Federal Defendants. *See Carmel–by–the–Sea, supra,* 123 F.3d at 1150. In other words, the court will determine if the agency has taken a "hard look" at what the range of possible alternatives should be. *See Muckleshoot, supra,* 177 F.3d at 814.

■ The claim is based on the requirement that an EIS "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). This regulation does not require an agency to "consider an infinite range of alternatives, only reasonable or feasible ones." *Carmel–by–the–Sea, supra,* 123 F.3d at 1155.

According to Plaintiffs, the fact that the Federal Defendants did not include a non-harvest "action" alternative in the Draft EIS shows that they did not consider all options that may have been reasonable or feasible. Plaintiffs rely heavily upon *Muckleshoot, supra,* to bolster their claim. In that case, it may be recalled, the USFS had struck a land-swap deal with Weyerhauser prior to issuing an EIS on the matter. The EIS analyzed three alternatives: the mandatory "no action" alternative, and two alternatives the Ninth Circuit called "virtually identical." 177 F.3d at 813. Prior to issuing the draft EIS in that case, the USFS preliminarily eliminated three other alternatives, including one which would have put deed restrictions on the land transferred to Weyerhauser. *Id.* The USFS in that case apparently never reconsidered the preliminarily rejected alternatives in the final EIS despite federal regulations which favored the imposition of deed restrictions. *Id.* at 813–14. The Ninth Circuit found that the USFS had not taken a "hard look" at the possible range of alternatives and enjoined the swap accordingly. *See id.* at 814.

Plaintiffs argue that the Federal Defendants violated the *Muckleshoot* principles in this case. In Plaintiffs' eyes, the alternatives set forth in the Draft EIS in this case were also "virtually identical" to one another because they were all a mix of timber harvest, underburning, and restoration. Defendants offer two responses.

First, Defendants argue that the Draft EIS did contain a "restoration only" option. This contention reads far too much in the Draft EIS. The Draft EIS, in fact, briefly mentioned that the USFS had considered but preliminarily rejected an "aquatic restoration" alternative that did not include timber harvest "because it would not address any of the effects of the Douglas-fir beetle infestation will have on timber stands, fire risk, wildlife habitat, scenery, or other forest components." Draft EIS, II–31. The Draft EIS simply did not invite comment on a "restoration only" alternative option—it expressly stated that such an option had been "eliminated" from consideration. It should be noted, however, that this treatment of alternatives is permitted under the NEPA regulations, which provide that "for alternatives which were eliminated from detailed study, [the agency shall] briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

Defendants more successfully distinguish *Muckleshoot* on the grounds that the alternatives considered were *not* "virtually identical." Although all of the "action" alternatives included an element of harvest, the level of harvest and the areas proposed to be harvested under the alternative varied. Alternative B, for example, was "designed to treat only the units which include known 1998 beetle infestations" and specifically avoided trying to predict where the beetle would move to next. FEIS, II–9. Alternative C targeted the same areas as Alternative B, but would have accomplished the goal without constructing new roads and via different logging methods on certain units to reduce the amount of environmental damage. FEIS, II–13. Alternative E was also a variation on Alternative B but would have resulted in logging only dead or dying trees (versus some green trees) and prohibiting all logging in old growth. FEIS, II–20. Alternative D, on the other hand, sought to treat both the areas that were infested in 1998 and the areas that were likely to become infested in 1999 and 2000. FEIS, II—16. Alternative D also proposed more prescribed burning than the other three "action" alternatives but added more miles of road obliteration and improvement, as well. FEIS, II–15.

These alternatives were not virtually identical. Nor do they demonstrate the Federal Defendants were attempting to guide the EIS toward a desired goal, as appeared to be the case in *Muckleshoot*. Moreover, unlike in *Muckleshoot*, the agency did resurrect, in the FEIS, alternatives that it had previously rejected without comment.

The FEIS contains extensive analysis of two alternatives that were excluded from the Draft EIS but were added to the FEIS in response to public comments. One, Alternative F, would have concentrated the logging and fuel treatment on those areas closest to homes and private property adjacent to the CNF. FEIS, II–23. The other, Alternative G, would have eliminated commercially logging entirely and performed all fire fuel treatment by underburning and manual thinning, pruning, and lopping of some trees. FEIS, II–37. Both of these alternatives, while ultimately rejected, received a full analysis equal to the other alternatives. The court cannot say that the Federal Defendants did not give the range of alternatives a "hard look," especially considering that they developed

two new alternatives to respond to public comment.

Plaintiffs argue that this was nonetheless a violation of the Forest Service Manual, which provides that "when timber harvest is proposed primarily for the purpose of ... forest stewardship ... practical and feasible non-harvest options ... must be analyzed in the environmental analysis process." (Ct.Rec.60, App.G–9, p. 6.) This mandate, Plaintiffs urge, was violated when a non-harvest option was not put forth for comment in the Draft EIS. That argument goes nowhere. First, this section from the Manual states only that a non-harvest option shall be considered at some time in the EIS process, not necessarily in a draft document. Alternative G was a non-harvest option and it was considered in detail in the FEIS. Second, the Ninth Circuit has held that the Forest Service Manual does not have the binding power of law on the USFS because the Manual is a statement of policy, not a regulation. *See Western Radio Services Co., Inc. v. Espy,* 79 F.3d 896, 897 (9th Cir.1996).

Plaintiffs also contend that the Federal Defendants violated NEPA when they failed to reissue the Draft EIS with Alternatives F and G open to public comment. Plaintiffs attempt to support this argument with citations to NEPA's implementing regulations, but those regulations give them very little to stand on. 40 C.F.R. § 1502.9(a) provides that a draft EIS must strive "to fulfill and satisfy the fullest extent possible the requirements" for a final EIS. The regulation continues, "if a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." Plaintiffs apparently do not contend—nor could they—that the Draft EIS in this case precluded all meaningful analysis of the issues. Rather, they contend that because a draft EIS should resemble a final EIS, the creation of a new alternative dictates the need for a new EIS.

Plaintiffs reach this conclusion by combining 40 C.F.R. § 1502.9(a) with 40 C.F.R. § 1503.4(a)(2), which provides that, when an agency is responding to public comments, it may "develop and evaluate alternatives not previously given serious consideration by the agency." According to Plaintiffs, this means that a final EIS can elaborate on an alternative that was given short shrift in the draft EIS, but cannot develop an alternative that was briefly mentioned in the draft but was preliminarily eliminated as a possible alternative. Alternatives falling into this second category, Plaintiffs argue, must be described in a new draft EIS under 40 C.F.R. § 1502.9(a). Plaintiffs also point out that the Draft EIS in this case refers only to the brief consideration and rejection of an "aquatic restoration" alternative while the eventual Alternative G involved much more than simply aquatic restoration—and therefore was allegedly a completely new alternative.

Plaintiffs' reading of the regulations, while arguably plausible, contradicts the plain language of the statutes. 40 C.F.R. § 1502.9(a) provides only that a draft EIS must be redrafted and reissued when it is so inadequate that it precludes meaningful analysis. It does not indicate that an agency must rework its draft if it later realizes an alternative it preliminarily rejected should be more fully developed. It simply does not require a new EIS in that case unless the EIS cannot support meaningful analysis without a full exposition of the preliminarily rejected alternative. By no means did the Draft EIS in this case fail that test.

In addition, a plain reading of 40 C.F.R. § 1503.4(a)(2) shows that it means almost exactly the opposite of what Plaintiffs con-

tend it means. The regulation makes it clear that an agency may revive in the final EIS an alternative that it had "not previously given serious consideration" in the draft. This means that something which was dismissed out of hand, in a short paragraph, can be reevaluated based on public comment. The restoration-only alternative that the USFS briefly mentioned in the Draft EIS in this case was properly revived and evaluated in the FEIS. The fact that Alternative G was apparently broader than the alternative mentioned in the Draft EIS does not mean that they were in fact different options—at the core they share the same key feature, restoration without timber harvest.

Contrary to Plaintiffs' contentions, this reading of the regulations does not stifle the give-and-take between agencies and the public that the EIS process is designed to provide. If anything, it encourages agencies to take public comments seriously and, if necessary, reconsider options it previously thought unviable. If an agency had to refile an EIS every time it felt compelled by public comment to reconsider a previously dismissed alternative, the agency "as a practical matter [might] become hostile to modifying the alternatives to be responsive to earlier public comment." *State of California v. Block,* 690 F.2d 753, 771 (9th Cir.1981).

The Federal Defendants took a "hard look" at a wide range of alternatives, and they did not violate the NEPA regulations by developing and evaluating Alternative G without redrafting the Draft EIS. They therefore did not act arbitrarily or capriciously with regard to the breadth and nature of the alternatives that they considered in the Draft EIS and the FEIS.

### D. Analysis of Project's Effect

Plaintiffs' seventh, eighth, and ninth claims allege that the Federal Defendants performed a defective analysis of the effects the Project would have on various elements of the environment. These claims are most easily understood and analyzed when broken down into two groups of claims: the contention that the FEIS did not adequately analyze the effects that the Project itself would have and the allegation that the FEIS did not adequately consider the cumulative effects of past, current, and reasonably foreseeable public and private projects.

### 1. Effects of the Project on Specific Environmental Elements

■ Plaintiffs challenge the basic adequacy of the FEIS analysis of how the various alternatives would affect fuels and fire, vegetation, fisheries, wildlife, watershed, and soils. These claims strike at the heart of agency expertise, and thus the USFS's analysis enjoys the greatest amount of deference from this court. This court is limited to determining if the analysis was arbitrary or capricious; if the agency gave the analysis a "hard look," the court must defer. *See Carmel–by–the–Sea, supra,* 123 F.3d at 1150–1151. In performing this analysis, the court will look separately at the analysis for each element.

### a. Fuels and Fire

One of the stated reasons for the adoption of the Project was to address the increased fire fuel and fire risk that was presented by the beetle outbreak. Draft EIS, II–10. As a result, the subject of fire and fuel received extensive treatment in the FEIS, consuming 15 pages of analysis for the Newport Ranger District alone. FEIS, III–765 to III–780. Those 15 pages begin with an extensive history of wildfire in the area, including the build-up of fire fuel over the last several decades, and proceeds into a discussion of flame length and fire intensity. The analysis also de-

scribes the methodology used to predict fire risk and intensity, and then proceeds to describe how each alternative would affect those variables. Included in the analysis is a separate chart of projected flame length over the next 130 years for each of Alternative A ("no action"), Alternative G ("restoration only"), and a group consisting of Alternatives B through F ("action" alternatives containing elements of timber harvest).

Plaintiffs' challenges to this analysis are twofold. First, they argue that the FEIS failed to take into consideration the effect of microclimates on fire risk—that is, the effect that temperatures, wind, humidity, and so forth can have on the risk that a particular fire will start in a particular area. The FEIS does not address these factors site-by-site, but it does go into great detail on how fires will be affected by the types of trees in the area, the diameter of the fuel, the paths that fires have historically taken in the region, and the number of trees dead and dying in a particular area. The court cannot say that in these circumstances that the USFS did not take a "hard look" at effects that the Project would have on fuels and risk of fire.

Plaintiffs' second complaint about the fire analysis is actually not a complaint about the analysis at all, but a complaint about the role of fire in the selection of Alternative D. Plaintiffs point to the fact that the FEIS states in numerous places that alternatives which include timber harvest would actually increase the short-term risk of fire and result in longer flame lengths in the short term, and would not result in a lower risk in the longer term than the non-harvest alternatives. The fuel and fire analysis states, for example,

salvage logging would increase potential flame lengths over the short term; this is because when these trees are harvested, all fuel would be on the ground

instead of accumulating more slowly as under the no action alternative.

FEIS, III–777. Many other such statements are scattered throughout the FEIS and ROD. *See, e.g.,* ROD Summary of FEIS at p. 34 ("areas treated with salvage harvest would continue to trend toward conditions that favor higher intensity wildland fires"); FEIS, App. A, A–75 ("even with lop and scatter methods, because of the relative rapid decay of fine fuels, the intensities of potential fires may not be very different from the No Action Alternative after several years").

Yet these statements do not demonstrate that the fire analysis itself was lacking. If anything, they tend to show that the FEIS gave a candid and honest appraisal of the fact that logging would actually increase the risk of wildfire. The statements do not indicate that the USFS gave fire and fuels anything other than a "hard look."

#### b. *Vegetation*

 The vegetation analysis focuses on the types of trees in the Newport Ranger District, and the likely effect that the various alternatives would have on the future composition of the stands in the forest. This section again begins with an analysis of how the Project analysis area, which was historically a diverse stand dominated by western larch and western white pine, became a landscape in which the Douglas fir is the most common tree. In order to put greater perspective on the differences between the current forest and the historical composition, the FEIS divides the Newport Ranger District into several different "biological settings" that represent different types of forest in the District (such as "Douglas-fir/grand fir with huckleberry"). The FEIS also discusses how Douglas fir are comparatively short-lived and susceptible to the bark beetle

and root diseases. FEIS, III–664 to III–674.

The analysis then launches into a discussion of how each of the alternatives would affect the makeup of the forest, with particular emphasis on how the "action" alternatives would remove Douglas fir and replace them with longer-lived, later-stage species such as larch, ponderosa pine, and white pine. The FEIS also includes a table of how each alternative would affect the makeup of the forests. FEIS, III–676 to III–681.

While Plaintiffs have stated a claim that this analysis is incorrect, they did not elaborate on it in the briefing. Indeed, the analysis is at least a "hard look" at the types of trees in the District, the benefits of moving toward a more diverse stand of timber in the area, and the extent to which each alternative will advance stand diversity.

### c. *Watershed*

■ Plaintiffs also complain that the FEIS does not take a "hard look" at the effect the various alternatives would have on the watersheds within the Newport Ranger District. The court disagrees.

The FEIS contains an extensive analysis of the watersheds in the area, their conditions, the reasons they are in their current state, and the effects that the proposed logging and restoration projects would have on the watersheds. Plaintiffs are correct that the FEIS admits that most of the creeks in the area are "functioning at risk," but also makes clear that the current watershed problems are due to past federal, state, and private timber management projects, as well as ongoing development and farming. FEIS, III–713 to III–717.

The key question for this court to consider is not whether the watershed is currently in poor condition but whether the FEIS adequately considered the possible effects of the Project on that watershed.

To that end, the FEIS applied a methodology called WATSED to determine the amount of sediment that the alternatives would contribute to the streams. That analysis included a consideration of the various types of action involved, including logging, underburning, road reconstruction, culvert upgrading, and road reconstruction. FEIS, III–720 to 724. This analysis was then applied to each individual watershed for each of the alternatives. FEIS, III–726 to III–738. The overall effect on each watershed was then summarized. FEIS, III–739.

Plaintiffs' problem appears to be not with the rigidity of the analysis but rather with the conclusion of the FEIS that all of the "action" alternatives would actually *reduce* sediment because they all include substantial reconstruction of roads that create sediment problems. FEIS, III–739. Plaintiffs' argument is, essentially, that common sense indicates that extensive logging of the type contained in the Project must have *some* negative effect on sediment.

As noted several times in this opinion already, however, this court's task is to ensure the USFS followed the procedures outlined in NEPA, not to quarrel or pick apart the agency's substantive conclusions. The watershed analysis is thorough and demonstrates that the USFS took a "hard look" at the effects the Project would have on watersheds. The court cannot say that the analysis was arbitrary or capricious.

### d. *Fisheries*

■ The closely related analysis of fisheries was similarly comprehensive. That analysis includes a list of all Newport area watersheds and the various species of fish species found in each. It also includes an analysis of which of the watersheds has been harmed in the past by road construction, burning, and timber harvest within

the riparian zone. FEIS, III–746 to III–751.

In order to determine what effects the alternatives would have on fisheries, the FEIS analyzes whether the alternatives would have any effect on habitat components such as stream temperature, habitat diversity, cover complexity, channel stability, and sediment rates. FEIS, III–752 to III–753. For each alternative and each watershed, the FEIS analyzes whether there would be any long-term or short-term effects on fish habitat or specific fish species. FEIS, III–756 to III–764. The analysis concludes that because the alternatives all include extensive watershed restoration projects and would not harvest any timber in riparian zones, any risks to fish populations would be small and short-term, although some alternatives would be better than others. FEIS, III–763. In some cases, the fish habitat would improve because of the restoration projects.

Plaintiffs' contention is that the USFS did not conduct a separate fish survey for the FEIS or rely on any other recent fish survey. In particular, Plaintiffs are concerned about the bull trout, a "threatened" species which the FEIS states is found only in one Project watershed, Indian Creek. Plaintiffs point out that when they requested a copy of the fish surveys in the area, the Federal Defendants provided only limited surveys and gave confusing responses to Plaintiffs' requests.

There is no doubt that the Federal Defendants were less than forthcoming about which fish surveys they had used to support their statements in the FEIS regarding what type of fish were in which creek. (Ct.Rec.61, App.G–34, G–38.) However, this court does not believe that a precise analysis of exact fish population data would have added significantly to the FEIS analysis, which properly focused on fish habitat. If there will not be any net adverse effects on habitat, it does not mat-ter how many fish are living in the habitat. The focus is on whether the habitat analysis was arbitrary or capricious. The court holds that it was not; the FEIS constitutes a "hard look" at fisheries in the analysis area.

e. *Wildlife*

 As for the impacts of the Project on wildlife, the FEIS provides a separate analysis of each alternative's potential effects on the "species of concern" that are known or suspected to live in the analysis area. Those species include a number of threatened or endangered species.

The analyses for each species focus on where the animals are known to exist and considers whether the known locations are within the areas scheduled for logging or burning under the alternatives. In most cases, the FEIS concludes that the Project will have "no effect" on the particular species because they are not known to use the areas slated for logging or burning. FEIS, III–787 to III–800. For grizzly bears, gray wolves, and the Canada lynx, the FEIS concludes that the Project may, but is not likely to, affect populations of these animals. FEIS, III–787 to III–791.

Plaintiffs challenge the analysis for only a few species. As to the bald eagle, Plaintiffs point out that the FEIS states both that the eagles do not use any habitat in the Project area and also that the eagles forage near Bead Lake, whose watershed is partially within the Project area. Plaintiffs contend this is clear contradiction. However, the FEIS is quite clear that "the project does not alter habitat along the Pend Oreille River corridor nor in the perch areas around Bead Lake" and that "the project is not adjacent to known nests or roost areas." FEIS, III–789. The court has no reason to doubt this conclusion or the FEIS analysis of the Project's impact on the bald eagle.

As to the lynx, which was proposed for a "threatened" species listing at the time of the FEIS and has since been listed as such, the FEIS states that Alternative D would adversely impact lynx denning habitat in the short term. The result would be that there may be "a one to five year avoidance" of those areas by the lynx but that there would be no long-term effects for lynx and it would be unlikely to jeopardize the lynx's continued existence. FEIS, III–790 to III–791. Plaintiffs' only challenge to this analysis appears to be that they doubt the FEIS's conclusion that there will only be a short-term avoidance and that there will not be any effect on lynx survival. Once again, Plaintiffs challenge the substance of the decision and not the process. The court finds nothing arbitrary or capricious about the analysis of the Project's effects on the lynx.

Plaintiffs also contend that the Federal Defendants failed to consult with the United States Fish & Wildlife Service regarding the Project's effects on threatened and endangered species before they adopted the Project. Plaintiffs appear to have made a factual error. The USFS submitted their highly detailed assessment of the Project's effects on threatened and endangered species to the U.S. Fish & Wildlife Service on June 2, 1999, after what they indicate were several discussions of the issues. (Ct.Rec.48, App.F.) The U.S. Fish & Wildlife Service concurred with the USFS's assessment on June 3, 1999. (Ct. Rec.48, App.H.) The ROD was not signed until June 11, 1999, and it specifically noted that the U.S. Fish & Wildlife Service had previously concurred. ROD at 17. There is no reason for this court to believe that the Project had been adopted before the USFS received the concurrence.

Plaintiffs' remaining claims regarding the wildlife analysis all focus on whether there was adequate consideration of the cumulative impacts that this Project would have on wildlife when combined with other projects in the analysis area. That claim is discussed later in this opinion as part of the general claim that the cumulative impacts analysis was inadequate.

As for the claim that the analysis of the Project's isolated effects on wildlife was inadequate, this court finds that the USFS took a "hard look" at what effects the Project would have on wildlife.

### f. *Soils*

■ The soils analysis is a different story, however. The FEIS acknowledges that there are two sets of soil problems within areas slated for harvest as part of the Project. First, several units suffer from "detrimental soil conditions," including "compaction, detrimental puddling, displacement, burned soils, erosion, and mass wasting." FEIS II–741. Logging tends to exacerbate these problems.

Second, the soil in many of the units suffers from a potassium deficiency. Trees without enough potassium tend to be stunted and may be more susceptible to root rot. FEIS, III–740 to III–741. Logging can greatly affect the amount of potassium in the soil because trees store potassium in their trunks, branches and foliage. In addition, certain logging methods cause greater erosion, thus worsening the potassium problem. FEIS, III–741 to III–742.

The exact extent of these problems, however, appears to be unknown. When preparing the FEIS, the USFS did not observe or test the soil conditions at each site. Rather, with regard to detrimental soil conditions,

> Using a combination of aerial photo interpretation, and data from the district's road databases, the existing condition for each was *estimated.* Using factors developed by the Idaho Panhandle National Forest soil monitoring data, the

extent of detrimental condition was *estimated.* Units that *may* exceed standards, or *may* be close to exceeding the standard were identified.... *The presale forester would be responsible to verify actual unit conditions and insure that the unit layout would meet the standards.*

FEIS, III–741 (emphasis added). This was the sole basis for determining which units might have detrimental soil conditions and therefore required special harvesting methods. There is nothing before this court to indicate that the USFS performed any individual, on-ground inspection of the soil conditions in a particular unit.

The analysis of the potassium levels in the soil was equally speculative. The FEIS gives the following summary of the potassium analysis:

> Soils developed on the Prichard and St. Regis geologic formations are potentially potassium limited. A map of proposed project units was overlaid on a map of geologic formations to determine which units occurred on the Prichard and St. Regis geologic formations.

FEIS, III–741 to III–742.

This analysis of the soil conditions in each of the units served as the basis for determining what logging methods would be permitted or prescribed for each individual unit. Those with suspected detrimental soil conditions or possible poor potassium levels were assigned skyline or helicopter harvesting, which "would cause little or no increase in detrimental soil disturbance." FEIS III–744. Harvests in areas with suspected low potassium levels were assigned harvest methods in which the branches of the trees would be left behind to leach out as much potassium as possible back into the soil. FEIS III–743.

Defendants argue that this analysis of the problem was sufficient because the USFS took a conservative approach to as-

signing harvesting methods by assigning the least detrimental harvesting methods to units that were only suspected of having detrimental soil conditions or low potassium levels. The problem with this argument is that because the USFS did not obtain detailed analysis of the soils, there was no way for it to know with any certainty whether it had considered all of the problematic soils within the bounds of the CNF portion of the Bark Beetle Project.

It is possible, for example, that certain units stated for harvest under Alternative D could suffer from detrimental soil conditions that could not be detected from a helicopter or potassium deficiencies that could not be detected by looking at a map of geologic formations. The USFS's analysis would not have caught such a problem and thus would not have indicated that a unit which such a problem should be harvest via skyline or helicopter.

In addition, even for the units which the USFS identified as having detrimental soil conditions or low potassium, it is possible that the USFS underestimated the effect that logging, even via skyline or helicopter methods, would have the unit. For example, the soil in at least two of the units in the Project was suspected by the USFS to exceed the regional forestry standards for detrimental soil conditions. These units were slated for harvest anyway, under the following rationale:

> The Regional Standard says that, if a site currently exceeds the standard, it can be treated if the treatment results in a net reduction in detrimental soil conditions. The use of existing skid trails and subsoiling would result in a net reduction, thereby meeting the soil quality standards.

FEIS, III–741. In other words, the USFS decided, without ever setting foot on the most severely damaged units, that the units could be logged because the harvest

would actually improve the soil. The court does not doubt that it is possible that the harvest could improve the soil. However, it is also within the realm of possibility that a particular unit could have such overwhelming detrimental soil conditions that it should not be the target of any harvest at all. The USFS did not countenance this possibility, nor did it even visit the sites it believed would exceed the regional standards to determine if the regional standard would in fact be complied with.

The shortcomings in the USFS analysis are all directly tied to the fact that they did not take the time to walk the areas that they planned to harvest. Instead, based on assumptions, geological maps, and aerial photographs, they *estimated* the condition of each unit, tried to determine which units *might* exceed established standards, and *projected* potassium levels. FEIS, III–741 to III–742. As the Ninth Circuit has held,

> General statements about "possible" effects and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not provided.

*Neighbors of Cuddy Mountain, supra,* 137 F.3d at 1380, *citing Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 764 (9th Cir.1996).

There is no indication in the FEIS why the necessary data could not be obtained. Indeed, it would be difficult for the USFS to show that it could not have sent its own foresters onto its own lands to observe the soil conditions and test the potassium levels on the areas subject to logging in the Project. They apparently planned to do so sometime in the future. They should have done it before they completed the FEIS. The failure to do so is a violation of NEPA because it shows that USFS did not give a "hard look" at the effects of the Project on the soils in the analysis area. This court will consider in a later section whether an injunction is appropriate to remedy the violation.

2. *Cumulative Impacts Analysis* (Seventh, Eighth, and Ninth Claims)

▆ Plaintiffs also claim that Federal Defendants failed to adequately consider the cumulative effects on the environment from the actions of past, present, and reasonably foreseeable actions on federal, state, and privately owned lands. NEPA regulations require that all agencies consider these "cumulative impacts." 40 C.F.R. § 1502.25(a)(2). The regulations define "cumulative impact" as

> the impact of the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions *regardless of what agency (Federal or non-Federal) or person* undertakes such other actions. Cumulative impacts can occur from individually minor but collectively significant action taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added).

The Ninth Circuit has regularly invoked this rule in enjoining agency projects. In *Carmel–by–the–Sea, supra,* the agency's final EIS listed and briefly addressed a number of foreseeable projects that would impact the same area as the agency project, but failed to discuss how all of the projects together would cumulatively affect the environment. *See* 123 F.3d 1142. This violation led to a Ninth Circuit order requiring the agency to perform the proper analysis. *See id.* at 1161.

In *Muckleshoot, supra,* the USFS had noted some other projects that could result in a cumulative impact with the proposed project but the agency had not provided sufficient detail of what that impact might be. *See* 177 F.3d at 810–11. In addition, it had effectively neglected to even consider a related USFS project that was "all

but certain" to occur. *Id.* at 811–12. The Ninth Circuit enjoined the project in part because the USFS's cumulative impacts analysis was too general.

The FEIS in this case shares several problems with the analyses considered in those cases. First, it is clear that the USFS did not undertake a diligent search for pending or approved state and private timber projects in the Newport analysis area. The analysis area, it should be noted, encompasses both federally-owned land and land owned by either the State of Washington or by private entities. The FEIS states that a full 40% of the analysis area is either private or state-owned. FEIS, III–775.

■ An agency must provide, at an absolute minimum, a list of all ongoing or reasonably foreseeable projects in the EIS. *See Carmel–by–the–Sea, supra,* 123 F.3d at 1142. In this case, the FEIS does list a few "ongoing and foreseeable" projects that are "within the boundaries of cumulative effects analysis areas." FEIS, Appendix E, at E–9. Only one project is listed for private or state lands, however, and that is a "large timber sale" in the Newport watershed planned for 2002 covering 540 acres. *Id.*

It is, however, undisputed that in February 2000, the USFS compiled a list of more than 50 private and state logging projects within the Project analysis area in the CNF. Some of the projects were adopted after the FEIS was granted. However, Plaintiffs have produced evidence that several of the private and state logging projects were, at a minimum, foreseeable before the FEIS issued.

Plaintiffs have furnished the court with the details of 9 private and state logging projects located in or near the Newport analysis area not mentioned or considered in the FEIS. The documentation of these projects originated with Washington State Department of Natural Resources, which reviews and then approves or denies applications to harvest timber on state or private land. (Ct.Rec. 63.) All of these 9 applications were made between January and June of 1999, when the Federal Defendants were considering and adopting the Project. All of the applications were approved, and 3 of them were approved by March 31, 1999, well in advance of the June 1999 publication of the FEIS and ROD. It is not clear when the rest of the applications were approved but information on at least 7 of the 9 applications (which included harvest plans, acreage, and maps), was available by May 1999. (See "Packet Created" cover pages of individual applications, Ct.Rec. 63.) The projects include road construction and reconstruction (at least some of which will be *within the CNF* (FPA # 3004226)), logging within riparian zones, logging on "highly erodible or unstable soils," logging within lynx habitat, and logging within wetlands. Three of the projects involve at least 1,000 million board feet of timber each. One of those three involves 5,965 million board feet and 555 acres. (Ct.Rec. 63, FPA # 3004052.)

Defendants admit that 8 of these 9 applications are within the Newport analysis area. As for the application which Defendants state is outside of the analysis area, Plaintiffs assert that it is adjacent to the analysis area. The court, however, cannot determine where this ninth application sits in relation to the Newport analysis area. Yet that is of little consequence given that 8 large projects are within the area's boundary.

■ Defendants' responses to the applications are weak. Defendants claim that this court should not hold them to research performed by an outside party well after the FEIS and ROD were completed. This argument simply sidesteps the real issue here. Under NEPA, agen-

cies have an affirmative duty to locate, describe, and consider other projects that could have cumulative impacts when combined with the project under consideration. *See Carmel–by–the–Sea, supra,* 123 F.3d at 1161. There is absolutely no indication in the record, or elsewhere, that Federal Defendants attempted to determine during the first half of 1999 if there were related private projects in the analysis area. This is despite the fact that information was available on at least 4 such projects was available before the end of April 1999 (the ROD was signed on June 11, 1999).

The nature of the analysis area—of which only 60% is federal forest—makes such a lack of diligence particularly troublesome. The state application information before the court, while limited, reveals that the projects impact upon numerous areas covered in the FEIS: vegetation, beetle spread, fire danger, soils, lynx habitat, watersheds, and fisheries. Not only does the FEIS not consider the impacts of the other projects on these elements of the environment, it does not even list them as current or foreseeable events.

There is no question that projects were current or foreseeable. Defendants themselves admit that 6 of the 9 projects in question were approved before the signing of the ROD. (Ct.Rec. 72 at 3.) Of those 6, 3 were approved several months in advance of the ROD. (Ct.Rec.63, Attachments.) As for the 3 that were approved after the ROD was signed, they were all documented in applications before the ROD was signed, in one case more than a month before. (Ct.Rec.63, Attachments.) The failure to locate information on these projects and list them in the FEIS was a violation of NEPA.

Federal Defendants argue, nonetheless, that the state and private projects did not need to be described because they were not "essential" to the decision about whether to implement the Project. This argument is based on 40 C.F.R. § 1502.22(a), which provides that

If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among the alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

Federal Defendants argue that this regulation means that if a reasonably foreseeable project is not "essential," an agency has no duty to obtain information on that project. The regulation, however, does not state such a rule and in fact is best read as a regulation concerning the relationship between the duty to analyze reasonably foreseeable events and the cost of obtaining information on those events. *Compare* 40 C.F.R. § 1502.22(b) (discussing what should be done when the costs of obtaining data are exorbitant). In addition, Federal Defendants' proposed reading of this regulation would allow an agency to decide that another project is not "essential" without attempting to obtain any information about that project. The court does not agree with this reading, as it would encourage agencies to blind themselves to information about other projects because that information might indicate the other projects are "essential" to the agency's decision.

In any event, even if Federal Defendants are reading the regulation correctly, this court does not agree that the state and private projects uncovered by Plaintiffs were not essential to a reasoned analysis of the Project. As noted above, the other projects involve many, many millions of board feet of timber and hundreds or thousands of acres of land within the Newport analysis area. Given that part of the stated impetus for the Project was the concern about the spread of the bark beetle and wildfire to private lands adjacent to

the CNF, what is being done on those lands is highly relevant to whether the Project is necessary. In addition, the entire purpose of the cumulative impacts analysis is to determine whether small impacts caused by an agency's project are compounded by other projects in the area. The sheer size of the state and private projects alone suggests that they are essential to determining whether the reportedly small effect that the Project will have on wildlife, for example, will be compounded by habitat obliteration in the state and private lands which are intermixed in the Newport analysis area. 40 C.F.R. § 1502.22, no matter how it is read, does not excuse the USFS's failure to obtain information about numerous private and state projects in the Newport analysis area.

Defendant–Intevernor also attempts to convince the court that the omission of the state and private projects was not a problem because some of the private projects have goals that appear to be consistent with the goals of the Bark Beetle Project (for example, by seeking to upgrade stands to late seral species). (Ct.Rec. 80 at 9–10.) This argument is akin to parking on a steep hill without setting the parking brake and then arguing that you were not negligent because nobody was hurt when your car careened down the hill. The fact that Defendants feel that some of the private projects it is now aware of might parallel the Project does not change the fact that the USFS did not determine what state or private projects would be undertaken in the Newport analysis area.

The same can be said for Defendants' argument that the USFS correctly predicted that private and state landowners would aggressively harvest beetle-killed trees. Even if Defendants predictions were accurate (and this court cannot verify whether they were), that does not change the fact that the USFS failed to take a "hard look"

at the cumulative impact of the Project and the non-federal harvests. The USFS may have been correct that private landowners and the State of Washington would harvest "aggressively," but without seeing what harvests were actually forthcoming, the USFS had no way of knowing how those other projects would affect wildlife, water, stand diversity, fire danger, and so forth.

The failure to determine what projects had been approved or were pending in the analysis area, on its own, is enough to establish a NEPA violation. It makes it clear that the USFS failed to take a "hard look" at cumulative impacts. However, the FEIS's cumulative impacts analysis is flawed further by the fact that it provides no detailed analysis of the current or reasonably foreseeable projects actually listed in the FEIS.

This is not to say that the FEIS does not dedicate a considerable amount of space to cumulative impacts. For each environmental element analyzed (fire, vegetation, etc.), the FEIS puts forth a separate paragraph or two which contains a discussion of "cumulative effects." Yet not a single one of these sections discusses a single specific project (federal, state, or private), not even the projects that are listed in the FEIS. One of the longer "cumulative effects" analyses is found in the "Vegetation" section, and it is representative of the quality of the analysis. It states, in part:

> The effects of past actions and other ongoing and foreseeable harvest and burning projects in the analysis area have been taken into account in the description and analysis of the current condition. A continuation of harvest proposals on federal lands is planned. These reasonably foreseeable actions ... were taken into account in the description and analysis of current condi-

tions.... A continued increase in grand fir, cedar, hemlock, and in some situations Douglas-fir, is likely to result form the harvest activities already in progress and planned on National Forest System Lands....

The effects of Douglas-fir beetle mortality on other ownerships within the analysis area are difficult to ascertain due to a lack of detailed information on current conditions and on how private landowners will treat beetle-killed trees. In very general terms, non-industrial forest owners and industrial forest owners are likely to aggressively harvest dead and dying trees because of their commercial value.... Private landowners that do harvest trees are less likely to invest money in reforestation, so most regeneration is likely to come from natural seeding. Therefore, there would be little change in composition to early seral species....

FEIS, III–676.

This extremely general discussion of cumulative impacts is not sufficient. The Ninth Circuit has held that an EIS

must ... include a 'useful analysis of past, present, and future projects. This requires 'discussion of how [future] projects together with the proposed project ... will affect [the environment].' *Detail is therefore required in describing the cumulative effects of a proposed action with other proposed actions.*

*Muckleshoot, supra,* 177 F.3d at 810 (emphasis added, brackets in original), *quoting Carmel–by–the–Sea, supra. See also Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1379 (9th Cir.1998) ("To 'consider' cumulative effects, some quantified or detailed information is required.") The FEIS cumulative effects analysis for vegetation, quoted above, demonstrates a pronounced lack of detail. As to the discussion in that analysis of the pending federal projects, the

FEIS states only that the cumulative effects "were considered," even though the USFS presumably has considerable knowledge about what those federal projects entail. Exactly what was "considered" is left to the reader's imagination and leaves this court without any way to determine if they were actually considered. As to non-federal timber projects, the analysis is even less detailed, offering pure conjecture instead of detailed analysis of the actual projects scheduled in the analysis area. The passage does not even discuss the one state project that was actually listed in Appendix E of the FEIS.

The court finds it unnecessary to perform a similar analysis of every one of the "cumulative effects" sections in the administrative record and the FEIS because they are all equally (or more) deficient. A few examples will demonstrate the universal inadequacy of the analysis. In the "Fisheries," "Recreation," and "Scenery" sections, the "cumulative effects" analyses do not even *mention* that there might be other projects (federal, state, or private) which could affect these elements. FEIS, III–757, III–808, III–817 to 818. And in several of the "Wildlife" subsections the "analysis" is simply a short paragraph informing the reader that "other ongoing or reasonably foreseeable activities which would have an impact on the [particular species] have been included in the determination of the total amount of habitat...." FEIS, III–788 (grizzly bear), III–788–789 (gray wolf), III–791 (Canada lynx), III–792 (pine marten). Once again, the USFS is assuring its readers that it "considered" other projects without revealing what it considered or how the other projects would or would not combine with the Bark Beetle Project to have or not have a cumulative impact.

Defendants claim that a deeper and more complete analysis of cumulative im-

pacts can be found in the administrative record not contained in the FEIS. However, the portions of the record submitted by Defendants exhibit the same deficiencies as the FEIS. First, those portions of the record address only watershed issues, and do not address the cumulative impacts on other elements of the environment. Second, those portions of the record are as general and speculative as the FEIS. For example, the analysis of cumulative impacts on the Indian Creek Watershed contains the following passage:

> Cumulative: The foreseeable actions in Indian Creek appear to include extensive regeneration harvesting by tractor on private lands. The proposed Douglas Fir Bark Beetle Salvage in tandem with the proposed foreseeable actions will affect hillslope function.

(Ct.Rec.42, Ex. E, N_WA_90, at 3.) This analysis and the other analyses Defendants have pointed to in the administrative record, like those in the FEIS, do not specify what projects were considered, or what the cumulative impacts will be.

The USFS did not give a "hard look" to the cumulative impacts that this project would have with the numerous federal, state, and private projects within the area. Under NEPA, cumulative impacts are not something that can be addressed briefly with generalities and assertions that the proper analysis has been done somewhere outside of the record. Without a detailed and reasoned analysis of cumulative impacts of specific projects, "neither the courts nor the public, in reading the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain, supra,* 137 F.3d at 1379. The USFS violated NEPA. The court considers in a later section whether an injunction is the appropriate remedy for this violation.

### E. *The Role of Financing and the Lack of Disclosure* (Fifth Claim)

Plaintiffs argue that the FEIS and the ROD violate NEPA because they select Alternative D solely on the basis that it is unlikely that Congress would appropriate the funds necessary to accomplish the restoration goals of a non-harvest option. Plaintiffs base their claim on 40 C.F.R. § 1502.22, which puts a burden on an agency to include information about reasonably foreseeable impacts in an EIS to the extent it is feasible to do so. To the extent it is not feasible to include the information, the EIS must include a statement regarding why the information is not available and discuss why the information would be relevant.

The statement at issue is found in the ROD. In discussing the problems the USFS found with "restoration-only" Alternative G, the ROD states "another consideration was that the amount of funding outside of a timber sale is much more limited and so eliminates Alternative G as a viable selection." ROD, 16. There is no other discussion in the ROD or the FEIS of how much funding would be available for restoration absent the inclusion of logging in the Project. Plaintiffs argue that NEPA requires much more disclosure than the USFS has given.

Plaintiffs' claim has merit. A close consideration of the FEIS reveals that financing was apparently a key factor in the election of Alternative D over Alternative G (which the FEIS states is essentially Alternative D minus the logging). Alternative G was equal or superior to Alternative D in every category analyzed in the FEIS except "finances." The following is a summary of the findings of each of those categories:

- *Beetle Population.* The FEIS is very clear (if not very loud) in its conclusion that nothing the USFS does is likely

reduce the beetle population. *See, e.g.,* FEIS, III–680 n. 2, and Appendix A, A–32, A–34.

● *Fire and Fuels.* Alternative D will "increase potential flame lengths over the short term; this is because when the trees are harvested, all fuel [will] be on the ground instead of accumulating more slowly as under the no action alternative." FEIS, III–777. Over the long-term, Alternative D is also no better in terms of fire risk than any other alternative. FEIS, App. A, A–75. Alternative G avoids the increased fire risk associated with logging and reduces fuel by underburning. FEIS, III–778 to III–779.

● *Vegetation.* Alternative D would "move 82 acres towards structural stage 7," which essentially means that the tree species composition would be improved and diversified on those acres. FEIS, III–678. Alternative G would also move 82 acres toward structural stage 7. FEIS, III–679.

● *Sensitive Plants and Wildlife.* Alternative G would create less of an impact on wildlife habitat and habitat suitable for sensitive plant species than Alternative D. FEIS, III–693 to III–695, III–786 to III–800.

● *Watersheds and Fisheries.* "If we were only looking at the watershed restoration issue, the acquatic/prescribed fire alternative (Alternative G) would have been the environmentally preferable alternative." ROD at 16.

● *Air Quality.* Alternatives D and G are essentially equal as to the effect they would have on air quality, as they both involve substantial prescribed burning. FEIS, III–784.

● *Recreation.* Alternative G would close fewer areas to recreation than Alternative D. FEIS, III–808.

● *Scenery.* Alternative G would have substantially less of a detrimental effect on scenery than Alternative D. FEIS, III–817.

The FEIS thus suggests that finances was the one category in which Alternative D was clearly preferable. The Record of Decision confirms that finances were a key consideration in the adoption of Alternative D, stating that "the amount of funding that is available outside of a timber sale is much more limited and so eliminates Alternative G as a viable solution." ROD at 216.

As Federal Defendants pointed out at the hearing, the ROD does state that Alternative D was also preferable because Alternative G

would not accomplish extensive vegetative restoration because of the need to delay burn events over a number of years to naturally generate early seral species, and the influx of competing vegetation during that time would lessen success of regeneration.

ROD at 16. There is reason to question whether this unsupported assertion in the ROD is in conflict with the FEIS's assertion that both Alternative D and Alternative G would move 82 acres toward the desired structural stage. FEIS III–678, III–679. However, even if the statement in the ROD is accurate and based on something more than speculation, the ROD merely states that this is an additional reason that Alternative D was preferred. The ROD makes it clear that the perceived lack of finances for restoration, on its own, was sufficient reason to reject Alternative G.

The court points this out not to indicate that it believes Alternative G was a better alternative than Alternative D, but rather to highlight the role that finances played in the decision. Despite the key role that finances played in selecting Alternative D, the record does not contain any analysis of the current CNF budget or how Alterna-

tive G could or could not be covered by that budget. The ROD indicates that a major drawback of Alternative G was that it would require the use of "limited" funds. Yet the USFS has not indicated how limited those funds were. The "Finances" section of the FEIS is dedicated entirely to an analysis of how much each alternative would cost and how much money each alternative would raise from timber sales. FEIS, III–823 to III–827. It does not indicate what other sources of funding were available, or indicate why other sources of funding could not cover the cost of the restoration projects.

At the same time, there are several indications in the record that at least some previously appropriated funding will be used for the Project. Plaintiffs have produced a USFS document regarding one of the units for sale under the Project which provides in part:

> Regeneration and/or fuels abatement projects will be paid for, at least partially, with appropriated funding since all of the regeneration need and a large part of the fuels treatment need were created by both snow damage during the winter of 1996/97 and the ensuing Douglas-fir beetle mortality. (Plaintiffs' Exhibit G–21, Ct.Rec. 61.)

There is absolutely no indication in the record why these funds could not have been used for a "restoration-only" alternative. Federal Defendants suggested at the hearing on summary judgment that the document Plaintiffs produced shows only that there was funding for restoration in one area of the CNF, but the document, at a minimum, strongly suggests that the USFS took a "hard look" at whether the proposed restoration could have been undertaken without harvest dollars.

In addition, in the briefing on these motions, Federal Defendants appear to have admitted that Alternative G's watershed restoration could have been funded by the USFS's current appropriations. They stated, "Plaintiffs are ... mistaken that the [FEIS] did not disclose what restoration activities could be undertaken with current appropriations.... The road information showing level of certainty for Alternative G was noted." (Ct.Rec. 74 at 10.) For support of this section, Federal Defendants cite to Appendix D of the FEIS, which assigns a "level of certainty" for each road restoration project under each alternative. For Alternative G, the level of certainty for each road project is "1," which means that the project would be "highly certain." FEIS, App. D, D–41, D–53. "Highly certain" means, in turn, that "Forest Service is committed to completing this work for the selected alternative independent of whether a sale sells or not." FEIS, App. D., D–40.

Federal Defendants' statement in their brief is perhaps too cryptic to qualify as an admission, since the court's understanding of Appendix D is that it addresses what road projects would be done under each alternative, and not how specific projects would be funded. However, the statement, combined with the apparent availability of appropriated funding for at least some of the restoration and the utter lack of disclosure regarding appropriations for restoration-only projects, leads this court to conclude that Federal Defendants did not give financing a "hard look."

NEPA's implementing regulations provide that "federal agencies shall to the fullest extent possible ... encourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). "NEPA procedures must insure that environmental information is available to officials and citizens before decisions are made and before actions are taken.... Most important, *NEPA documents must concentrate on the issues that are truly*

*significant to the action in question....*"
40 C.F.R. § 1500.1. That duty includes a specific requirement to adequately discuss cost/benefit considerations "which are likely to be relevant and important to a decision." 40 C.F.R. § 1502.23.

Federal Defendants have fallen well short of these requirements. The ROD makes it clear that the (un)availability of appropriated funds was one of the key reasons the USFS chose Alternative D, and a close analysis of the FEIS and the ROD suggest that it was the primary reason that the USFS adopted the Project in its current form. Yet at the same time, the USFS never disclosed what it could or could not have done with current appropriations and documents indicate that at least some currently scheduled restoration will be funded by appropriations rather than timber sales. This is a clear violation of NEPA. The court will now consider whether the Project should be enjoined, and to what extent.

## V. The Need for and the Scope of the Injunction

 As noted above, Federal Defendants violated NEPA in several different ways. Defendant–Intervenor nonetheless contends that the court should not issue an injunction because the equities do not balance out in favor of an injunction. Defendant–Intervenor is correct that a finding that an agency has violated NEPA does not automatically result in an injunction. *See, e.g., Forest Conservation Council v. United States Forest Service*, 66 F.3d 1489, 1496 (9th Cir.1995). This court must instead determine whether the Project would result in an irreparable injury and, if so, "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

 Yet in an environmental case such as this, the scales are from the outset tipped in favor of an injunction. The Supreme Court has held that

environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, permanent. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of injunction to protect the environment.

*Id.* at 545, 107 S.Ct. 1396. Contrary to what Defendant–Intervenor claims, the implementation of the Project would result in irreparable harm—it would mean the permanent removal of thousands of trees and burning of hundreds of acres of land. Therefore, Defendants must come forward with "unusual circumstances" which indicate that an injunction would be inappropriate. *Forest Conservation Council, supra*, 66 F.3d at 1496.

Defendants make three arguments that the circumstances here are unusual, but all of them are unpersuasive. First, Defendants argue that Defendant–Intervenor and other landowners with land adjacent the Newport Ranger District face the threat of increased beetle populations if this court enjoins the Project in the CNF. However, as already noted earlier in this opinion, the FEIS makes it abundantly clear that the USFS does not believe that the Project (or any other forest management policy) can reduce the number of Douglas-fir bark beetles or prevent their spread to other stands of timber. *See, e.g.,* FEIS, App. A, A–32, A–34.

Defendants' second claim of "unusual circumstances" is that there will be an increased risk of fire unless the Project commences immediately. To the contrary, the FEIS states that the Project will actually increase the short-term risk of fire beyond the risk that would be present if

the USFS did absolutely nothing. *See, e.g.,* FEIS, III–777.

Defendants third "unusual circumstance" is that the local timber industry would be deprived of the opportunity to log the areas slated for sale under the Project. However, Defendants have provided no documentation of a need for timber. In fact, one concern addressed in the FEIS was whether the influx of timber from the Project would lower already depressed prices for Douglas fir and thereby actually injure the local economy. FEIS, III–827; FEIS, App. A, A–63 to A–65 (noting there were 25 public comments expressing concern about this issue). In fact, the FEIS also indicates that other federal timber sales have been put on hold in favor of the sales under the Project so that the timber market is not flooded. FEIS, III–827. An injunction of the Project would not affect those other sales going forward and replacing whatever void the injunction might create.

Nor is the court convinced by Defendants' argument that the Project provides so many environmental benefits that those benefits outweigh the NEPA violations. Contrary to their assertions, the Project did not necessarily adopt the most environmentally friendly alternative—the ROD states that the best alternative, from the standpoint of watershed restoration, was Alternative G. ROD, p. 16. In addition, the Project will not have an appreciable effect on stand diversity within the CNF. Alternative D commits only to upgrading 82 acres of forest to later-stage trees, a drop in the bucket on a forest the size of the CNF. FEIS, III–678. Defendants have not come forward with an "unusual circumstance" which would warrant the denial of an injunction to remedy the NEPA violations that this court has found.

Defendants argue further, however, that they have already remedied the NEPA violations and that therefore an injunction would not be proper in this case. In *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000), the Ninth Circuit held that "if extra-record evidence shows that an agency has rectified a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question of whether relief should be granted." In that case, the Ninth Circuit held that the USFS had violated NEPA but concluded that because the USFS had, post-EIS, taken a "hard look" at certain issues, an injunction would "serve no useful purpose" because the USFS had already done what the injunction would have required it to do. *Id.* at 561.

At the hearing, Federal Defendants contended that the USFS had already taken another "hard look" at certain aspects of the Project, in particular the cumulative impacts of the Project would have with pending and foreseeable private and state projects within the analysis area. This court requested that Federal Defendants provide documentation of the further analysis. Yet, while Federal Defendants did provide additional citations to the administrative record, the materials Federal Defendants provided do not show a detailed, post-EIS analysis of soils, cumulative impacts, or finances.

However, this court's review of the materials submitted by the parties did unearth two documents which indicate that in February 2000, the USFS considered the private and state projects in the Project analysis area. Those documents indicate that on February 3, 2000, Newport Ranger District ecologist Teresa Catlin contacted the Washington Department of Natural Resources to obtain information on all timber-harvest applications on land within the Project analysis area. Catlin then "created a gis project ... so that [she] could overlay the analysis area and subwatershed boundaries on the harvest applica-

tion cover. By using this [she] could tell whether the affected section was partially or completely within the analysis area and which subwatersheds the section fell in." (Ct.Rec.61, Ex. 24.)

On February 11, 2000, a group of USFS scientists who had assisted in the development of the Project met to discuss several items related to the project. The report from that meeting states that

[t]he team discussed the new information on private harvest applications that was summarized in another spreadsheet and displayed on a map of the project area.... The team agreed that, for wildlife and sensitive plants, our project did not add any cumulative effect to any effect that private actions might have on those resources. We agreed that that was probably the case for watershed and fish as well, but that more information was needed and that a reevaluation would be done....

(Ct.Rec.61, Ex. 39.) This court's review of its files uncovered no document which indicates that such a further analysis occurred, much less any documentation of such an analysis. Nor is there any indication that there was any consideration of whether there could be a cumulative impact on the other factors addressed in the FEIS, such as air quality, scenery, recreation, and so forth.

The evidence Defendants have submitted does not establish that the USFS took a post-EIS "hard look" at cumulative impacts. While the USFS finally obtained information about other projects in the analysis area nine months after adopting Alternative D, there is no evidence before the court which indicates that the USFS considered those other projects in any detail, or that they considered the possibility of cumulative impacts outside of wildlife, plants, watershed, and fish. An injunction would insure that the cumulative impacts were considered in detail as required by NEPA.

In addition, there is nothing now before the court which indicates that the USFS ever took a closer look at the soils on the units slated for harvest. Although the FEIS stated that "[t]he pre-sale forester would be responsible to verify actual unit conditions and insure that the unit layout would meet the standards," FEIS, III–741, Defendants have not submitted any evidence that such surveys were actually performed. Therefore, there is no evidence that the USFS ever determined whether its estimates of the soil conditions were accurate. The record before the court does not show that the USFS has taken a "hard look" at soil conditions to date.

Furthermore, the materials submitted to the court do not establish that the USFS ever considered, post-EIS, whether the restoration could be completed without timber-harvest money. The record before the court does not show that the USFS has taken a "hard look" at non-harvest funding for the restoration portion of the Project.

After balancing the considerations, the court finds that an injunction is both necessary and proper in this case. The much-trumpeted danger of beetle spread and wildfires will simply not be affected by this court's injunction because the Project would not reduce the risk of either. There is no demonstrated danger of local economic disaster as a result of the injunction, nor will an injunction result in the loss of any significant opportunity to increase the tree species diversity in the Project area. In addition, the USFS has not demonstrated that it has already remedied its NEPA violations.

The only remaining question for this court is what the scope of the injunction should be. At a minimum, the injunction must prevent implementation of the Pro-

ject until the USFS has performed an adequate soils analysis, given detailed and thorough consideration to the cumulative impacts this Project might have with the state and private projects in the area, and thoroughly explored its options for funding the restorative aspects of the Project. However, Plaintiffs also claim that Federal Defendants are under a duty to redraft and redistribute the entire EIS for comment because there have been so many changes to the Project since the FEIS was published.

Plaintiffs' claim is based on 40 C.F.R. § 1502.9(c)(1), which requires an agency to prepare a supplemental EIS if "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." In other words, "if there remains 'major Federal actio[n]' to occur and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner ... a supplemental EIS must be prepared." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In reviewing this claim, the court must determine whether the USFS acted "reasonably" when it determined that the adjustments to the Project were not "significant." *Alaska Wilderness, supra,* 67 F.3d at 727.

There is no doubt that the USFS has made numerous adjustments to the Project since its adoption in June 1999. The most dramatic change is that as of February 25, 2000, of the 4,328 acres originally proposed for harvest under the Project, 3,301 acres (representing 76% of the Project in the CNF) had been "deferred to later sales" because "field examinations subsequent to the signing of the ROD have

revealed that the Douglas-fir beetle outbreak did not spread as extensively to all of the locations anticipated in the FEIS." (Ct.Rec.61, App.G–48.) In addition, there have been several changes to the maps of certain units, changes in harvest method from skyline and tractor methods to the soil-friendly helicopter method, and changes to the method of fuel treatment in some units from lop-and-scatter to prescribed burning. (*Id.*)

The question put to this court is whether these changes are "substantial" or "significant" from an environmental impact point-of-view. Defendants argue strenuously that the changes are neither. Defendants point out that Alternative D was designed to be adjusted after the exact scope of the outbreak had been determined. The description of the alternative states, in part:

> Alternative D was developed to address the concern of not treating acres where the beetle infestation would likely spread over the next 2 years. Alternative D takes a more adaptive approach by proposing also to treat certain nearby high hazard stands if they should become infested, or if infestation levels in these stands increase during this epidemic.... On the Newport district, all stands analyzed under this EIS have current beetle infestations. Those units in Appendix D with an "a" following the unit number are stands that are a lower priority to harvest either because the infestation in 1998 was fairly light or because of access or other concerns.

FEIS, II–16.

There is a substantial disagreement between the parties about how much flexibility was built into this option. The disagreement arises from the fact that the units dropped from the Project due to lower-than-predicted infestation include "a" units as well as units that had not been given that "lower priority" marking. As of

February 25, 2000, 24 units had been dropped from the CNF portion of the Project due to low beetle activity. Of those 24 units, 7 were lacking an "a" label. (Ct. Rec.61, App.G–50.)

Plaintiffs argue that this shows that Defendants so miscalculated the extent of the beetle outbreak that even units which the FEIS indicated had to be treated due to the extent of the beetle kill were found upon closer inspection to have low beetle activity. Defendants answer that Alternative D did not "lock in" any units for harvest, and that the FEIS left them considerable leeway to drop any unit in response to further study. Plaintiffs' reading, however, best reflects the FEIS's description of Alternative D. While the FEIS does not unequivocally state that any unit without an "a" next to it would be logged due to beetle problems, the clear implication is that the "a" units were subject to further study while the other units were not. In fact, the entire purpose of flagging a unit with an "a" was to designate the unit as a place where the infestation might explode. The clear implication is that units without an "a" had already been the subject of such an explosion. In fact, before Plaintiffs raised this particular point, Federal Defendants wrote that "timber harvest units denominated 'a,' or 'alpha' are only treated if beetle mortality reaches the threshold to make a feasible … timber sale offering. … Whether the 'a' units will suffer the level of beetle mortality remains to be seen." (Ct.Rec.47, p. 12–13.) Again, the clear implication is that the other units would be sold because the infestation was so extensive in those areas. The fact that some of these units were dropped raises serious questions as to the efficacy of the initial survey.

There is also a serious question about what effect the greatly reduced amount of timber sales will have on the USFS's ability to undertake the restoration projects provided for in Alternative D. Of the numerous road projects contained in that alternative, only one road restoration project was listed as "highly certain"; all of the other projects are to a greater or lesser extent dependent upon timber sales. FEIS, App. D, D–40, D–53 to D–54. Whether or not these projects are completed will make a substantial difference in the Project's effect on watersheds and fisheries. The Project is apparently beneficial to the watersheds with the restoration, but is it detrimental in its current scope? FEIS III–706 to III–739.

The court recognizes that, in effect, the deferral of 76% of the timber harvest will have some environmental benefits—the soil in the deferred units will not suffer further compaction or potassium loss, wildlife will not be disturbed, and so forth. Yet the Project has at least a partial goal of improving the watershed by reducing erosion, and of increasing the diversity of the timber stands. It is not at all clear what will happen to the restorative aspects of the Project given that two-thirds of the proposed harvest has been deferred, nor is it clear that the deferred units will never be harvested. Counsel for Federal Defendants indicated at the hearing that the USFS has not necessarily abandoned the deferred harvesting and that it might revisit that harvesting in the future. There is apparently no deadline by which the USFS feels that it would have to finally determine whether the harvesting should ever take place in the deferred units.

This court cannot say that it was reasonable for Federal Defendants to determine that a supplemental EIS was unnecessary in this case. As Federal Defendants admit, the Project currently resembles Alternative E more than it resembles Alternative D. (Ct.Rec.74, p. 21.) In effect, Federal Defendants have

switched alternatives without inviting public review or comment. Seventy-six percent of the Project has been dropped because the beetle has not spread as predicted. A large portion of the dropped acreage was in areas that had reportedly been so devastated already that logging was clearly necessary. The beetle has not acted as predicted, and the Project must be reevaluated in light of the new information. In addition, the effects of the changes on restoration projects must be analyzed, as must the question of whether the deferred harvesting projects should be abandoned entirely or deferred in perpetuity.

This is not, as Defendants claim, the situation presented in *Laguna Greenbelt, Inc. v. U.S. Department of Transportation*, 42 F.3d 517 (9th Cir.1994). In that case, the agency had issued an EIS regarding the construction of a new stretch of highway. After the final EIS had been issued and an alternative adopted, a group of wildfires broke out in the area and an environmental group sued, claiming a supplemental EIS was required. The Ninth Circuit held that a supplemental EIS was not necessary because the EIS had taken into account the effects of wildfires and had closely analyzed whether the wildfires added any new impacts not addressed by the EIS. *See id.* at 529–30.

*Laguna Greenbelt* did not address a situation such as this, where the significant and substantial new information and events strike at the very heart of the Project and in fact raise questions about the rationale for adopting the Project. The *Laguna Greenbelt* wildfire was an external event that did not change the need for the highway. The lower-than-expected beetle numbers, however, radically changed the nature of the Project itself and the changes were so outside the flexibility built into the Project that Federal Defendants must prepare a supplemental EIS that addresses the current situation.

At the summary judgment hearing, the court asked the parties to submit a stipulation as to the scope of any injunction and specifically requested that the parties attempt to agree as to what should be done with trees that have been felled but have not yet been removed. The parties have not yet reached such a stipulation. However, the injunction may be modified based on such a stipulation, or if the parties disagree, upon further submittals by the parties.

Accordingly, Federal Defendants are hereby enjoined from implementing the Project in the Colville National Forest until it has prepared a supplemental EIS which analyzes, at a minimum, the following:

1. The actual soil conditions and potassium level in each unit proposed for harvest and the effects that the harvest methods will have on the soil in each unit.

2. The cumulative impact which all current and reasonably foreseeable federal, state, and private projects within the Newport analysis area will have on all of the factors analyzed in the FEIS.

3. The extent to which current appropriations could fund a non-harvest restoration alternative.

4. The extent to which the deferral of several of the proposed timber sales affects all of the elements analyzed in the FEIS, with particular attention to the effect the unit adjustments have on proposed restoration projects.

5. The conditions that would cause the USFS to revisit the deferred harvests and the likelihood that those conditions will occur.

This injunction will not apply to the following:

1. All actions already completed under the CNF portion of the Project.

2. All logs which have already been felled in units slated for harvest may be removed.

3. For units in which the harvest is complete, the USFS and the private timber companies who completed the harvest may complete all usual and customary post-harvest actions.

4. No part of the Project which is contained in the Idaho Panhandle National Forest shall be enjoined or affected by this injunction.

## VI. Conclusion

**IT IS HEREBY ORDERED:**

1. Federal Defendants' Motion for Summary Judgment (Ct.Rec.46) is GRANTED IN PART and DENIED IN PART as provided above.

2. Defendant–Intervenor's Motion for Summary Judgment (Ct.Rec.50) is GRANTED IN PART and DENIED IN PART as provided above.

3. Plaintiffs' Motion for Summary Judgment (Ct.Rec.59) is GRANTED IN PART and DENIED IN PART as provided above.

4. Plaintiffs' Motion to Strike (Ct.Rec. 103) is DENIED.

5. Federal Defendants' Motion to Strike (Ct.Rec.71) is DENIED.

6. Plaintiff's Motion for Temporary Restraining Order (Ct.Rec.200) is DENIED AS MOOT.

7. The Project is enjoined as outlined above.

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.