GOODWIN, Circuit Judge:
Oregon Natural Resources Council Fund et al. (ONRC) appeals a summary judgment in favor of the Bureau of Land Management (BLM). We reverse and remand.
ONRC challenged the “Mr. Wilson” logging project in the Glendale Resource Area of the Medford BLM District in Oregon, on the ground that the project violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370Í. The specific violation was alleged to consist of conducting an insufficient Environmental Analysis. ONRC argues that the BLM did not sufficiently consider the cumulative impact of the Mr. Wilson logging project in conjunction with other past, present, and reasonably foreseeable projects on timber harvest levels and on the northern spotted owl’s critical habitat. The district court concluded that because logging operations had been completed the cause was moot, and granted summary judgment.
I. Background
The BLM issued an Environmental Assessment (EA) for the Mr. Wilson logging project in the Glendale Resource Area of the Medford BLM District in July 2001. In October 2001, the BLM issued a Finding of No Significant Impact on the human environment and therefore did not prepare a more thorough Environmental Impact Statement.
ONRC commenced this action to halt the project in a timely manner but did not succeed in obtaining a preliminary injunction. ONRC contends that the BLM failed to comply with NEPA’s environmen *820 tal review requirements and seeks declaratory and injunctive relief. The parties cross-moved for summary judgment, and the district court issued an order granting summary judgment to the BLM on June 23, 2004. Meanwhile, logging proceeded.
On August 23, 2004, ONRC moved the district court for relief from the summary judgment, citing two subsequent decisions: Lands Council v. Powell, 379 F.3d 738 (9th Cir.2004), as amended 395 F.3d 1019 (2005), and Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989 (9th Cir.2004) (KSWC).
The district court denied the requested relief, holding that a change in law does not trigger Federal Rule of Civil Procedure 60(b)(5), and that there were no extraordinary circumstances present to warrant invocation of Rule 60(b)(6). The district court did state that “[notwithstanding [its holding], the court would reconsider the June 23, 2004 order in light of subsequent Ninth Circuit precedent if the court of appeals were to find that procedure to be appropriate.” Final judgment was entered on February 7, 2005.
ONRC filed without success a motion for injunction pending appeal. The district court stated that KSWC “raises serious questions regarding this court’s holding that the Bureau of Land Management’s (BLM) analysis of cumulative effects on northern spotted owls and late-suceessional habitat dependent species and the habitat is sufficiently rigorous to satisfy the requirements of the National Environmental Policy Act.” The court then denied ONRC’s motion, stating that “[although plaintiffs have raised a serious question for litigation on the merits, this relatively small project is nearing completion, with only commercial thinning operations remaining on lands allocated for timber production.”
On appeal ONRC contends that the Mr. Wilson EA lacked a sufficiently detailed analysis of the cumulative effects of past, present, and reasonably foreseeable future timber harvests on late-successional habitat.
II. De Novo Review
We review NEPA compliance de novo. Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1069-70 (9th Cir.2002). Through the NEPA process, a federal agency must “take[] a ‘hard look’ at the potential environmental consequences of the proposed action.” KSWC, 387 F.3d at 993 (quoting Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir.2001)). “The agency’s actions, findings, and conclusions will be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Id. at 992 (internal quotation marks omitted).
Our inquiry into whether an agency’s decision was arbitrary or capricious “must ‘be searching and careful,’ but ‘the ultimate standard of review is a narrow one.’ ” Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).
III. Mootness
The BLM argues that this action is moot because all of the timber harvesting has been completed and there remain no project activities that could cause a significant environmental impact. “[I]n deciding a mootness issue,’the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.’ ” Nw. Envtl. Def. Ctr. v. Gordon, 849 *821 F.2d 1241, 1244-45 (9th Cir.1988) (quoting Garcia v. Lawn, 805 F.2d 1400, 1403 (9th Cir.1986)).
When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities “could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable.”
Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir.2001) (quoting West v. Sec’y of the Dep’t of Transp., 206 F.3d 920, 925 (9th Cir.2000)).
In its complaint ONRC sought declaratory and injunctive relief in addition to costs, fees, and “[sjuch other and further relief as this Court deems just and proper.” The Mr. Wilson project is not finished, and the absence of a proper Environmental Assessment affected, or at least could have affected, not only the logging decision but also the post-logging mitigation decision. The absence of the appropriate “hard look” analysis thus has present consequences. Although the harvested trees cannot be restored, “[bjecause harm to old growth species may yet be remedied by any number of mitigation strategies,” this case is not moot. Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1066 (9th Cir.2002) (identifying possible relief beyond preventing logging including ordering the Forest Service to study the timber sale’s impacts on species viability and to mitigate those impacts in the sale area and elsewhere, ordering the Forest Service to adjust future timber plans to compensate for this allegedly unlawful one, and more direct species population intervention such as monitoring population trends and developing artificial habitats for their recovery). Neighbors involved claims under both NEPA and the National Forest Management Act of 1976 (NFMA), and while the court determined the case was not moot because of relief available under NFMA, it did not conclude that the appellants’ NEPA claim was moot for lack of available relief. Rather, the court held there was no NEPA violation in the first instance, because the agency had taken the required “hard look” at potential environmental impacts. Id. at 1071. Conversely, the BLM has not taken the requisite “hard look” in this case, a failure that, as discussed below, has present consequences. Our holding is also consistent with Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147 (9th Cir.2006). In that case the logging company had a continuing right to cut trees that met certain tree mortality guidelines, while the three-year project term in this case has expired. However, the live controversy in Earth Island did not exist solely because of the prospective right to continue logging, but also because there were “a variety of measures that could provide some effective relief, including revising the tree mortality guidelines, monitoring of the California spotted owl, and obtaining more accurate population surveys” of certain bird species. Id. at 1157-58.
In the instant case, thinning and other husbandry functions were yet to be completed at the time the case was submitted, and an appropriate EA can yet yield effective post-harvest relief. In addition to hazardous fuel and slash pile management (together with related mitigation of past damage and prevention of future damage that could be accomplished by road closures), erosion prevention, and monitoring of the logging effects on northern spotted owl activity, the record in this case reveals BLM preparation for future sales in contiguous or neighboring habitat areas. All such concerns have to be considered with reference to habitat deterioration in the *822 “hard look” required in a legally sufficient EA.
IV. How the EA falls short
The Mr. Wilson Environmental Assessment is inadequate for the reasons previously explained in KSWC. First, the BLM failed to disclose and consider quantified and detailed information regarding the cumulative impact of the Mr. Wilson logging project combined "with past, present, and reasonably foreseeable logging projects. Second, the EA was tiered to other documents that did not contain the requisite site-specific information about cumulative effects.
A. Quantified and Detailed Information
The BLM failed to disclose and consider quantified and detailed information regarding the cumulative impact of the Mr. Wilson logging project combined with past, present, and reasonably foreseeable logging projects. The BLM distinguishes the requirements of an Environmental Assessment from an Environmental Impact Statement (EIS), and argues that the Mr. Wilson EA contains enough information to allow it to determine that the project would have no significant environmental impacts. This argument in effect says that the EA is sufficient “because we say it is.” As discussed below, case law in this circuit holds that such an answer must be supported by proper procedure.
In determining whether a proposed action will significantly impact the human environment, the agency must consider “[wjhether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.” 40 C.F.R. § 1508.27(b)(7). NEPA’s implementing regulations define cumulative impact as “the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.” 40 C.F.R. § 1508.7.
The Mr. Wilson EA’s discussion of cumulative impacts identifies seven past and future actions which could affect the watershed. The EA notes that:
The Key Elk, Mr. Wilson, and future Bear Pen and Willy Slide timber sales, would remove or modify up to approximately 1,000 acres of late-successional habitat. Several large blocks greater than 300 acres, functioning as corner to corner contiguous habitat with other blocks, are likely to be substantially reduced, and fragmented. The remaining small isolated habitat blocks in some sections are likely to be harvested, removing the last late-successional blocks in some sections.
The EA then addressed the effects of this removal on high mobility and low mobility species. “Species with high mobility, such as northern spotted owls, would likely still be able to disperse across the landscape,” while “[t]he dispersal capability of species with low mobility, such as Del Norte salamanders, red tree voles, and mollusks, would be substantially reduced.... ”
KSWC addressed a similar cumulative impact objection to EAs. Like the Mr. Wilson EA, the EAs at issue in KSWC did not contain objective quantified assessments of the combined environmental impacts of the proposed actions. KSWC, 387 F.3d at 994. The discussion of future foreseeable actions consisted of “an estimate of the number of acres to be harvested. A calculation of the total number of acres to be harvested in the watershed is a neces *823 sary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres.” Id. at 995. The EAs also stated that environmental concerns such as air quality, water quality, and endangered species would not be affected. Id. However, “[t]he EA is silent as to the degree that each factor will be impacted and how the project design will reduce or eliminate the identified impacts. This conclusory presentation does not offer any more than the kind of general statements about possible effects and some risk which we have held to be insufficient to constitute a hard look.” Id. (internal quotation marks omitted). Both the Mr. Wilson and the KSWC EAs “do not sufficiently identify or discuss the incremental impact that can be expected from each successive timber sale, or how those individual impacts might combine or synergistically interact with each other to affect the [watershed] environment.” Id. at 997.
B. Tiering
The Mr. Wilson EA is tiered to documents which did not contain the requisite site-specific information about the impacts of past, present, and reasonably foreseeable logging.
“Tiering” refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.
40 C.F.R. § 1508.28.
The Mr. Wilson EA is tiered to the West Fork Cow Creek Wastershed Analysis, and to the Medford District Proposed Regional Management Plan-EIS (RMP-EIS). In KSWC, we held that the Med-ford District RMP-EIS could not save the EAs because it was missing “any specific information about the cumulative effects. Neither in the RMP-EIS nor in the EAs does the agency reveal the incremental impact that can be expected ... as a result of each of these four successive timber sales.” KSWC, 387 F.3d at 997. The BLM contends that, unlike the Mr. Wilson project land, the land involved in KSWC was not matrix land identified to produce a sustainable supply of timber and other forest commodities. However, both cases involve Tier 1 Key Watersheds which contain designated critical habitat for the northern spotted owl. Id. at 992. Contrary to the BLM’s contention, KSWC is not distinguishable on this ground. Tiering to the Medford District RMP-EIS does not save the EA’s cumulative effects analysis. Prepared in 1997, the West Fork Cow Creek Watershed Analysis similarly does not address the incremental impact of the Mr. Wilson logging project, and therefore does not save the cumulative effects analysis. Moreover, the Watershed Analysis is not a NEPA document and therefore the EA cannot tier to it. Id. at 998.
V. Conclusion
The summary judgment is reversed. On remand, the district court is instructed to enjoin the remainder of the Mr. Wilson project until the BLM provides a revised Environmental Assessment, including the required hard look at cumulative impacts of the logging already completed on contiguous habitat areas or neighboring habitat areas to be impacted by contemplated future sales.
REVERSED and REMANDED with instructions.